# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **DENISE S.,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:17-cv-000921-AJB** |
| **v.** | : | |
| | : | |
| **COMMISSIONER, SOCIAL** | : | |
| **SECURITY ADMINISTRATION,**[1] | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[2]

Plaintiff brought this action pursuant to § 205(g) of the Social Security Act ("the

Act"), 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the

Commissioner of the Social Security Administration ("the Commissioner") denying her

---

[1]    Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated March 14 & 15, 2017).  Therefore, this Order constitutes a final Order of the Court.

application for Disability Insurance Benefits ("DIB").[3] For the reasons set forth below, the final decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

## I.   *PROCEDURAL HISTORY*

On December 23, 2013, Plaintiff filed her application for DIB alleging a disability onset date of August 25, 2013.  [Record (hereinafter "R") at 221].  Her application was denied initially on April 24, 2014, and upon reconsideration, August 25, 2014.  [R156, R165].  Thereafter, Plaintiff filed a written request for hearing.  [R168].  Plaintiff appeared and testified at a hearing before an Administrative

---

[3]      Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income ("SSI") for the disabled, whereas Title II of the Social Security Act provides for federal DIB, 42 U.S.C. § 401, *et seq.*  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.    *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations herein should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

AO 72A
(Rev.8/8
2)

Law Judge ("ALJ") on November 5, 2015, where she was represented by an attorney and a vocational expert ("VE") testified.  [R112].

On June 3, 2016, the ALJ issued a decision denying Plaintiff's application for disability benefits.  [R72-82].  Plaintiff then filed an appeal with the Appeals Council ("AC"), which denied review on November 15, 2016, making the ALJ's decision the final decision of the Commissioner.  [R9].

Plaintiff subsequently filed this action on March 13, 2017, seeking review of the Commissioner's decision.  [Docs. 3, 5].  The answer and transcript were filed on November 6, 2017.  [Docs. 7, 8].  On August 29, 2017, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 11], and on September 28, 2017, the Commissioner filed a response in support of the decision, [Doc. 14], to which Plaintiff replied, [Doc. 13].  The matter is now before the Court upon the administrative record, and the parties' pleadings and briefs,[4] and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

---

[4]     Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

## II.   PLAINTIFF'S CONTENTIONS

Plaintiff claims that the ALJ's decision is not supported by substantial evidence because she failed to properly evaluate Plaintiff's credibility and all of Plaintiff's impairments and, therefore, wrongly rejected her pain and limitations. [Doc. 11 at 5].

## III.   STATEMENT OF FACTS

### A.   Background

Plaintiff was born in 1956 and was 59 years old on the alleged onset date. [R221]. Plaintiff completed high school and has past relevant work as a secretary, receptionist, accounting assistant, and a caregiver. [R131-32]. She initially alleged disability due to deep vein thrombosis ("DVT") and inferior vena cava ("IVC") placed in her chest. [R271].

### B.   Lay Testimony

Plaintiff testified that, before she injured her back at work in June 2013, she worked as a caregiver through a company that sent her to patient's homes to assist with activities such as bathing, walking, moving in and out of wheelchairs, light housekeeping, and meal preparation. [R113-14]. She did not have any special training for this position but she did do some lifting of patients who were paraplegic. [R114]. She testified that she injured her back in June 2013 and went to the emergency room;

4

was bedridden in July; went for follow-up care to doctors referred by her former employer (as it was considered a worker's compensation injury); and was hospitalized in August 2013. [R115].

Upon questioning from the ALJ, Plaintiff responded that she is unable to work because of her DVT, which causes swelling and pain in her left leg from the foot through the groin and the lower back, making if difficult to walk, sit, and, sometimes, lie down. [R116-17]. She also testified that she passes out from time to time, for unknown reasons, and thinks it may be due to her heart (as this has been an issue since childhood), which her medical providers referred to as syncope and which occurred most recently in March 2014. [R117]. She testified that she continues to have DVT and an IVC filter in her chest, and, in December 2014, clotting between her knee and groin was detected. [*Id.*]. She testified that without support hose, her leg, feet, and groin become terribly engorged, but, with the hose, she still experiences pain and spasms, which she attributes to DVT. [*Id.*]. She explained that she takes Baclofen for her DVT and Xarelto as an anticoagulant. [R118-19].

Plaintiff further testified that her low back pain comes and goes two or three times a week, lasting a few days. [R119]. She testified that it does not take a lot to trigger it, such as sitting with little or no support or trying to get out of a chair, which

5

then causes tension and pain running down her leg. [R119-20]. She described that to relieve this pain, she lies down and takes pain medication, such as Oxycodone or Gabapentin, which make her sleepy, and therefore, she did not take medication the day of the hearing. [R120-21]. She also testified that she uses Lidocaine patches and had an epidural steroid injection planned for November, after her hearing. [R121].

Plaintiff also testified that she has been going to therapy for her shoulder and her doctors scheduled therapy for April 2016. [R118]. She testified that she was told by doctors that she had osteoarthritis in the rotator cuff and bursitis in her knee and possibly some in her back. [R129]. She further claimed that she has carpal tunnel in her right hand which causes numbness in her thumb and first two fingers and a feeling of the muscle pulling through the arm. [R122]. She testified that this causes gripping problems, especially with repetitive motions, such as preparing food and handwriting. [R123]. She also testified that she had neck problems between the hairline and shoulders, which also causes a headache. [*Id.*].

Plaintiff indicated that the combination of her medications causes grogginess and that Tramadol, in particular, causes dizziness, so she only takes it at night. [R124]. When she experiences these side effects, she sleeps. [*Id.*]. She has been seeing the doctor, including rotator cuff therapy, an average of three of four times a month. [*Id.*].

6

AO 72A
(Rev.8/8
2)

She testified that she experiences pain six out of seven days in the week so she limits her activities, spending most of her time reclining and even using a potty to avoid moving to the bathroom. [R125]. She stated she reclines because, with the swelling, her heart doctor (Dr. Aber Mhed) advised her that she needs to have her leg over her heart. [R126]. She reported that she experiences swelling daily and, two or three times a week, the stocking does not fully compress it. [*Id.*]. She acknowledged that her primary care doctor had advised her to exercise three times a day to lose weight so, at one point, she walked 15 minutes a day. [R127].

Plaintiff also testified that she has ongoing renal issues and stool incontinence since August 2013. [R128]. She explained that she wears support to prevent soiling herself. [*Id.*]. She testified that she is seldom free of pain and her pain averages a six out of ten three times a week, but is more severe the other days. [R129]. She indicated that she takes her medication as prescribed. [R130].

### C. Medical Records

#### 1. Treatment for Musculoskeletal and Neurological Conditions

In June 2013, Plaintiff presented to the emergency room complaining of low back pain over the previous two days that radiated into the left buttock and leg. [R383]. On examination, she had a full range of motion in the back and mild positive straight

7

leg raise test[5] on the left and an MRI[6] was conducted. [R382, 384]. She was diagnosed with acute low back pain, back strain, and acute left sciatica.[7] [R382-83]. Her symptoms improved with treatment and she was discharged with a prescription for Ultram,[8] Prednisone,[9] and Valium,[10] advised to apply moist heat to the back, ice the left

---

[5]    The straight leg raise test is used to place tension on the sciatic nerve to aid in the diagnosis of the presence of nerve root compression of the lower lumbar nerve roots (L4-S1). The clinician notes the symptoms produced and the degree of hip flexion at which these symptoms occur. A positive result is when the patient's familiar leg symptoms are reproduced between 30 and 70 degrees of hip flexion. Straight Leg Raise, Science Direct, https://www.sciencedirect.com/topics/neuroscience/straight-leg-raise (last visited 9/18/18).

[6]    Magnetic resonance imaging ("MRI") uses a large magnet and radio waves to look at organs and structures inside the body. MedlinePlus, MRI Scans, http://www.nlm.nih.gov/medlineplus/mriscans.html (last visited 9/18/83).

[7]    Sciatica is pain that radiates along the path of the sciatic nerve, which branches from the lower back down each hip and thigh. It typically affects one side of the body and is caused by a herniated disc, bone spur on or narrowing of (stenosis) the spine, which compresses the nerve, causing pain and numbness in the affected leg. Sciatica Overview, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/sciatica/symptoms-causes/syc-2037 7435 (last visited 9183/18).

[8]    Ultram (tramadol) is in a class of medications called opiate (narcotic) analgesics and is used to relieve moderate to moderately severe pain. MedlinePlus, Tramadol, http://medlineplus.gov/druginfo/meds/a695011.html (last visited 9/18/18).

[9]    Prednisone is a corticosteroid sometimes used to treat certain types of arthritis. MedlinePlus, Prednisone, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited

8

buttock, and follow up with orthopedics. [*Id.*]. In November 2013, Plaintiff again reported pain from sciatica and was prescribed hydrocodone.[11] [R434-35].

In March 2014, Plaintiff reported that she had developed constant right shoulder pain that radiated down to her right thumb, numbness in her hand, and muscle spasms. [R439]. Examination revealed tenderness in the right subacromial groove[12]; positive Neer,[13] Tinel,[14] Hawkins,[15] and median nerve[16] compression signs; numbness; tingling;

_____

9/18/18).

[10]    Diazepam, also known by the brand name Valium, is typically used to relieve anxiety, muscle spasms, and seizures. MedlinePlus, Diazepam, https://medlineplus.gov/druginfo/meds/a682047.html (last visited 9/18/18).

[11]    Hydrocodone is a narcotic that relieves pain and coughing. *See* M e d l i n e P l u s , H y d r o c o d o n e , http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited 9/18/18).

[12]    The acromioclavicular joint ("AC joint") is a joint at the top of the shoulder where the collarbone (clavicle) meets the shoulder blade (scapula). *Johns Hopkins Sports Medicine Patient Guide to "AC" Acromioclavicular Joint Problems*, Johns Hopkins Medicine, http://www.hopkinsortho.org/ac_joint.html (last visited 9/18/18). The subacromial space is between the AC joint and the underlying muscle and tendon that form part of the rotator cuff. Subacromial Space, University of Bristol, https://www.ole.bris.ac.uk/bbcswebdav/institution/Faculty%20of%20Health%20Sciences/MB%20ChB%20Medicine/Year%203%20MDEMO%20-%20Hippocrates/Hippocrates/shoulder%20pain%20etutorial/subacromial_space.html (last visited 9/18/18)

[13]    The Neer Test is commonly used in orthopedic examinations to test for subacromial impingement. The Neer test is considered positive if pain is reported in the anterior – lateral aspect of the shoulder. Physical Therapy Web, Neer Test –

9

160 degrees of flexion[17]; and a very limited range of motion.  [R440, 487].  She was

_____

Orthopedic    Shoulder    Examination, http://physicaltherapyweb.com/neer-test-orthopedic-shoulder-examination/ (last visited 9/18/18).

[14]  The Tinel test is a common test for carpal tunnel syndrome.  In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist.  The test is considered positive if the result is tingling in the fingers.  Nat'l Inst. of Neurological Disorders & Stroke, Carpal Tunnel Syndrome Fact Sheet, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Carpal-Tunnel-Syndrome-Fact-Sheet (last visited 9/18/18).

[15]  The Hawkins Kennedy Test is one of the most common special tests used in orthopedic physical assessment and examination of the shoulder.  The Hawkins Kennedy test is considered positive if pain is reported in the superior – lateral aspect of the shoulder.  Physical Therapy Web, Hawkins Kennedy Test – Orthopedic    Shoulder    Examination, http://physicaltherapyweb.com/hawkins-kennedy-test-orthopedic-shoulder-examination/ (last visited 9/18/18).

[16]  The median nerve, colloquially known as the "eye of the hand," is one of the three major nerves of the forearm and hand.  It courses from the brachial plexus in the axilla to innervate the intrinsic muscles of the hand.  Median nerve entrapment syndrome is a mononeuropathy that affects movement of or sensation in the hand.  It is caused by compression of the median nerve in the elbow or distally in the forearm or wrist, with symptoms in the median nerve distribution.  Carpal tunnel syndrome (CTS), the best-known and most common form, is defined as a constellation of symptoms associated with compression of the median nerve at the wrist.  *Median Nerve Entrapment*, https://emedicine.medscape.com/article/1242387-overview (last visited 9/18/18)

[17]  Flexion refers to the bending of the spine "so that the concavity of the curve looks forward."  *PDR Med. Dictionary* 663 (1st ed. 1995).

diagnosed with right carpal tunnel and rotator cuff syndrome and an MRI was recommended, as was nighttime splinting. [R440].

An October 2014 x-ray showed minimal degenerative changes in the Plaintiff's AC joint and some calcification adjacent to the trochanter[18] representing calcific tendonitis.[19] [R524]. Plaintiff was taking Flexeril[20] for lumbago[21] and applying Diclofenac[22] gel to ease her right shoulder pain. [R515]. A November 2014 x-ray

---

[18]    The trochanter is the bone at the top end of the thighbone (femur). Am. Academy of Orthopaedic Surgeons OrthoInfo, Hip Bursitis, http://orthoinfo.aaos.org/topic.cfm?topic=A00409 (last visited 9/18/18).

[19]    Calcific tendonitis is caused by calcium deposits on a muscle or tendon that may cause pain or discomfort. Bethany Cadman, *What is calcific tendonitis and what causes it*, Apr. 23, 2018, https://www.medicalnewstoday.com/articles/321583.php (last visited 9/18/18).

[20]    Flexeril (cyclobenzaprine) is a skeletal muscle relaxant. MedlinePlus, Cyclobenzaprine, https://medlineplus.gov/druginfo/meds/a682514.html (last visited 9/18/18).

[21]    Lumbago describes pain in the mid and lower back; the term does not specify the cause of the pain. *PDR Med. Dictionary* 998 (1st ed. 1995).

[22]    Diclofenac is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs"). It works by stopping the body's production of a substance that causes pain. MedlinePlus, Diclofenac Transdermal Patch, https://medlineplus.gov/druginfo/meds/a611001.html (last visited 9/18/18).

AO 72A
(Rev.8/8
2)

showed multilevel cervical[23] spondylosis[24] most advanced at C5-C6 and minimal

anterolisthesis[25] of C3 and C4 which persists with flexion and reduces on extension.

[R525].

A January 2015 MRI of Plaintiff's right shoulder revealed a rotator cuff tear and

osteoarthritis in her right shoulder. [R532-33]. A February MRI of Plaintiff's lumbar

spine[26] showed multilevel degenerative changes of the lumbar spine, including

foraminal[27] and extra-foraminal disc protrusions on the left at the L2-L3 and L3-L4

---

[23]    Cervical refers to the cervical spine which is made up of the first seven
vertebrae in the spine, starting below the skull and ending in the thoracic spine (upper
back).    Univ. of Maryland Med. Ctr., Cervical Spine Anatomy,
https://www.umms.org/ummc/health-services/orthopedics/services/spine/patient-gui
des/cervical-spine-anatomy (last visited 9/18/18).

[24]    "Spondylosis" refers to stiffening vertebra and is "often applied
nonspecifically to any lesion of the spine of a degenerative nature." *PDR Med.
Dictionary* 1656 (1st ed. 1995).

[25]    In anterolisthesis, the upper vertebrae slips forward on the one below it.
Cedars-Sinai, *Anterolisthesis*,
https://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolisthesis.aspx   (last
visited 9/18/18).

[26]    Lumbar spine refers to the portion of the vertebral column from the middle
back to the pelvis.    *See PDR Med. Dictionary* 998 (lumbar)(1st ed. 1995).

[27]    Foraminal refers to the nerve opening where a nerve root leaves the spinal
canal. MedlinePlus, Foraminotomy, https://medlineplus.gov/ency/article/007390.htm
(last visited 9/18/18).

AO 72A
(Rev.8/8
2)

levels, encroaching on the exiting left L2 and L3 nerve roots and a disc protrusion and free disc fragment at L4-L5 contributing to moderate spinal canal stenosis and moderate right and severe left neural foraminal stenosis.[28] [R535]. Plaintiff was referred to an occupational therapist, who she began to see in March 2015. [R589].

In late March 2015, Plaintiff reported pain on a scale of six out of ten and, on objective examination, had a limited range of motion in her mid back and right shoulder, and tested mildly positive for Speeds,[29] Hawkins, and Empty Can[30] tests. [R589-90]. Her occupational therapist concluded that she was she was "making gradual progress with therapy" and benefitting "from conservative treatment . . . to decrease pain and to restore full ROM/function of" her right shoulder. [R590].

---

[28]    Stenosis causes narrowing in the spinal canal, which in turn puts pressure on the nerves and spinal cord and can cause pain. MedlinePlus, Spinal Stenosis, https://medlineplus.gov/spinalstenosis.html (last visited 9/18/18).

[29]    The Speeds Test involves pressing down on the patient's forearm while the elbow is fully extended and in front of the body at 60 degrees flexion and the patient tries to resist. A positive test is one where the patient feels pain in the elbow and mid indicative of biceps tendon instability or tendonitis. https://physicaltherapyweb.com/speeds-test-long-head-biceps-tendinitis-orthopedic-shoulder-examination/ (last visited 9/18/18).

[30]    The empty can test is used to assess whether the shoulder is impinged and the strength of the muscle and tendon. *See* http://physicaltherapyweb.com/empty-can-test-shoulder-orthopedic-examination/ (last visited 9/18/18).

AO 72A
(Rev.8/8
2)

In July 2015, Plaintiff reported that, because her pain improved for several months, she stopped taking Oxycodone[31] because she did not like the way it made her feel but, because she still needed something for her sciatic nerve pain, was "taking Tylenol like it is candy." [R622]. On examination, there were no abnormal findings. [R623]. Nevertheless, she was diagnosed with controlled hypertension, chronic anticoagulation (but with resolved bleeding and vitals stable), lumbar spinal stenosis and herniated disc, and sciatica on the right side. [R624]. She was prescribed Tramadol and Baclofen.[32] [*Id.*].

In October 2015, Plaintiff continued to report back, joint, and neck pain and was diagnosed with degenerative disc disease, carpal tunnel syndrome, and right rotator cuff sprain. [R672]. Later, on examination, she had: painful forward flexion and abduction;

---

[31]    Oxycodone is a narcotic used to relieve pain. MedlinePlus, Oxycodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html (last visited 9/18/18).

[32]    Baclofen acts on the spinal-cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases, relieves pain, and improves muscle movement. MedlinePlus, Baclofen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last visited 9/18/18).

14

AO 72A
(Rev.8/8
2)

positive Hawkin's and supraspinatus[33] tests; tenderness with palpation at the right heel bone; and positive tenderness with palpation at the pes anserine bursa.[34]  [R675].  She was assessed with plantar fasciitis, pes anserine bursitis, right rotator cuff tear, right subacrominal bursitis, and degenerative disc disease of the cervical spine.  She was referred to occupational therapy for her rotator cuff and a pain clinic for a cervical injection.  [R675-76].  Clearance was needed from cardiology that she could go off Xarelto[35] before administering an epidural steroid injection[36] on her left L4-L5 and L5-

---

[33]    Supraspinatus is the smallest of the four muscles which comprise the Rotator Cuff of the shoulder joint specifically in the supraspinatus fossa. Supraspinatus, https://www.physio-pedia.com/Supraspinatus (last visited 9/18/18).

[34]    The Pes Anserine is the knee tendon and the bursa are the small, jelly-like sacs between bones and soft tissues at various joint around the body.  Pes anserine bursitis is inflammation of the bursa between the shinbone (tibia) and three tendons of the hamstring muscle, occurring when the bursa become irritated and produce excess fluid, causing them to swell and put pressure on adjacent parts of the knee.  Pes Anserine (Knee Tendon) Bursitis, OrthoInfo, https://orthoinfo.aaos.org/en/diseases--conditions/pes-anserine-knee-tendon-bursitis (last visited 9/18/18).

[35]    Xarelto (also known as Rivaroxaban) is an anticoagulant, used to prevent blood clots from forming due to irregular heartbeat or after certain hip or knee replacement surgeries and to treat blood clots (such as in deep vein thrombosis or pulmonary embolus) and prevent the formation of blood clots. https://www.webmd.com/drugs/2/drug-156265/xarelto-oral/details (last visited 9/18/18).

[36]    An interlaminar epidural steroid injection, often referred to simply as an "epidural injection," involves placing the needle into the back of the epidural space and

15

AO 72A
(Rev.8/8
2)

S1 to treat pain associated with stenosis, and she was prescribed Lidocaine patches[37] and Gabapentin,[38] and the Baclofen, Diclofenac, and Tramadol were continued. [R677].

_____

delivering the steroid over a wider area. KnowYourBack.org, Epidural Steroid I n j e c t i o n s , https://www.spine.org/KnowYourBack/Treatments/InjectionTreatmentsforSpinalPain/ EpiduralSteroidInjections.aspx (last visited 9/18/18).

[37] Lidocaine transdermal patches are used as a local anesthetic. They work by stopping nerves from sending pain signals. *See* MedlinePlus, Lidocaine Transdermal, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html (last visited 9/18/18).

[38] Gabapentin, also known by the brand name Neurontin, is often used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (the burning, stabbing pain or aches that may last for months or years after an attack of shingles) and restless legs syndrome. MedlinePlus, Gabapentin, https://medlineplus.gov/druginfo/meds/a694007.html (last visited 9/18/18).

AO 72A (Rev.8/8 2)

After the ALJ's decision, Plaintiff submitted records to the AC. [R16-66]. These records reflect that, in August 2016, Plaintiff received medial branch blocks[39] in her lumbar spine at L3, L4, and L5. [R729-30].

## 2. Treatment for Renal, Cardiovascular, and Lymphatic Issues

Plaintiff was taken to the emergency room in August 2013 by her family after she displayed an altered mental status and generalized weakness which worsened over the previous three days. [R384]. She also complained of low back and leg pain, which caused problems moving her left lower extremity. [R355]. On examination, she was in mild to moderate distress; unable to raise her arms overhead due to weakness; and had pain in her left leg. [R384]. Laboratory data (including a blood work up and

---

[39] Medial branch block is an injection of local anesthetic placed outside the joint space near the nerve that supplies the joint called the medial branch. The injection may or may not also include a steroid. Medial branch blocks are typically ordered for patients who have pain primarily in their back coming from arthritic changes in the facet joints or mechanical low back pain. Brigham & Women's Hosp., Facet & Medial Branch Blocks, http://www.brighamandwomens.org/Departments_and_Services/anesthesiology/Pain/Patients/blocks1.aspx (last visited 9/18/18).

AO 72A
(Rev.8/82)

Doppler) showed DVT in her left leg. [*Id.*]. A CT scan[40] revealed a hard, three centimeter nodule in her right inferior thyroid lobe. [R365-66, 388].

Plaintiff was diagnosed with acute renal failure with possible underlying kidney disease, and left leg swelling with DVT, hypercalcemia,[41] hyperthyroidism, and urinary tract infection. [R384]. The nodule was removed in surgery. [R386]. In addition, a new IVC filter with a catheter was placed. [R371]. She was admitted to the in-patient hospital physician and treated with intravenous fluids, Rocephrin,[42] and Heparin[43]

---

[40]     Computed tomography ("CT") imaging uses x-ray equipment to make cross-sectional pictures of the body. MedlinePlus, CT Scans, http://www.nlm.nih.gov/medlineplus/ctscans.html (last visited 9/18/18).

[41]     Hypercalcemia is a condition in which the calcium level in the blood is above normal. Too much calcium in blood can weaken bones, create kidney stones, and interfere with how the heart and brain work. Hypercalcemia is usually a result of overactive parathyroid glands. Hypercalcemia Overview, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hypercalcemia/symptoms-causes/syc-20355523 (last visited 9/18/18).

[42]     Rocephrin (ceftriaxone) is used to treat a wide variety of bacterial infections. This medication belongs to a class of drugs known as cephalosporin antibiotics. It works by stopping the growth of bacteria. https://www.webmd.com/drugs/2/drug-9768/rocephin-intravenous/details (last visited 9/18/18).

[43]     Heparin is an anticoagulant used to decrease the clotting ability of the blood and help prevent harmful clots from forming in blood vessels. This medicine is sometimes called a blood thinner, although it does not actually thin the blood. Heparin will not dissolve blood clots that have already formed, but it may prevent the clots from becoming larger and causing more serious problems.

AO 72A
(Rev.8/8
2)

(which was later discontinued because her platelet levels dropped).  [*Id.*, R386].  She was later treated with Coumadin,[44] which was therapeutic, as her International Normalized Ratio ("INR")[45] came within the therapeutic and slightly supratherapeutic range.  [*Id.*].  She was prescribed Soma,[46] Percocet,[47] Meloxicam,[48] Flexeril, and

---

https://www.mayoclinic.org/drugs-supplements/heparin-intravenous-route-subcutaneous-route/description/drg-20068726 (last visited 9/18/18).

[44]    Coumadin (warfarin) is a blood thinner that works by decreasing the clotting ability of the blood.  MedlinePlus, Warfarin, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html (last visited 9/18/18).

[45]    International Normalized Ratio ("INR") is a standardized method of reporting the effects of an oral anticoagulant such as warfarin on blood clotting.  There is a very small difference between the lowest dose that gives a good effect and the highest dose before side effects (which may be serious) are experienced.  https://www.myvmc.com/investigations/blood-clotting-international-normalised-ratio-inr/#C2 (last visited 9/18/18).

[46]    Soma is a brand name for carisoprodol, a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  *See* MedlinePlus, Carisoprodol, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html (last visited 9/18/18).

[47]    Percocet is a combination of oxycodone and acetaminophen and is a narcotic analgesic used to relieve moderate-to-severe pain.  MedlinePlus, Oxycodone, https://medlineplus.gov/druginfo/meds/a682132.html (last visited 9/18/18).

[48]    Mobic (meloxicam) is in a class of medications called nonsteroidal anti-inflammatory drugs ("NSAIDs") and is often used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis.  MedlinePlus,

AO 72A
(Rev.8/8
2)

Methylprednisolone[49] for her back and leg pain. [R355]. She stabilized and was discharged with instructions to follow up with her primary care doctor, blood work, and the doctor who removed the node. [R349, 355-56].

Plaintiff went to physical therapy in September 2013 for left lower extremity edema[50] and lymphedema.[51] [R397]. On examination, the volume in her left leg was 36.55 percent greater than that in her right leg and her left leg had decreased sensation, abnormal skin color, a hard, shiny, and spongy texture, severe thickening of her connective tissues (fibrosis), and a decreased functional range of motion in her ankle,

---

Meloxicam, https://medlineplus.gov/druginfo/meds/a601242.html (last visited 9/18/18).

[49]  Medrol (methylprednisolone) is a corticosteroid commonly used to relieve inflammation and to treat certain forms of arthritis. MedlinePlus, Methylprednisolone, https://medlineplus.gov/druginfo/meds/a682795.html (last visited 9/18/18).

[50]  Edema refers to swelling caused by fluid in the body's tissues. It usually occurs in the feet, ankles, and legs, but it can involve the entire body. MedlinePlus, Edema, https://medlineplus.gov/edema.html (last visited 9/18/18).

[51]  Lymphedema refers to swelling that generally occurs in one of the arms or legs. Lymphedema is most commonly caused by the removal of or damage to lymph nodes as a part of cancer treatment. It results from a blockage in lymphatic system, which is part of the immune system. The blockage prevents lymph fluid from draining well, and the fluid buildup leads to swelling. While there is presently no cure for lymphedema, it can be managed with early diagnosis and diligent care of the affected limb. https://www.mayoclinic.org/diseases-conditions/lymphedema/symptoms-causes/syc-20374682 (last visited 9/18/18).

knee, and hip. [R397-98]. She reported that the swelling in her left leg affected her mobility and made it difficult to bathe, wear shoes, cook, and clean without elevating her and that her pain was a three out of ten. [R398]. A September 2013 follow-up noted that Plaintiff still had a clot, edema in her left leg from the toes to the thigh, and was using a walker and receiving therapy twice a week for left leg DVT. [R436-37].

In November 2013, after several weeks of therapy, she still had left leg edema but was able to wear a shoe on her left foot, was wearing compression stockings, had slight swelling and fibrosis and was encouraged to continue to bandage her leg at night and/or purchase a night-time garment. [R418-24, 434].

In March 2014, Plaintiff still had edema when she presented to the emergency room complaining of chest pain intensifying over the previous week. [R459]. Although her INR and creatinine[52] levels were notable, there were no other abnormalities and it was noted that she was due for her Coumadin check. [*Id.*]. It was also noted that Plaintiff's prolonged inactivity due to her sciatica had provoked DVT. [*Id.*]. In addition, an unspecified kidney and ureter disorder were mentioned. [R465].

───────────────

[52]     Creatinine is a chemical waste molecule generated from creatine, which is a molecule used for muscles' energy production, that is filtered by the kidneys and evacuated as urine. Charles Patrick David, MD, *Creatinine*, https://www.medicinenet.com/creatinine_blood_test/article.html (last visited 9/18/18).

AO 72A
(Rev.8/8
2)

Later that month, her INR was found inadequate and increases were prescribed. [R488]. That same month, Plaintiff reported passing out due to lightheadedness when she got up from sleep to use the bathroom; she was diagnosed with hypertension and placed on Amlodipine[53] daily. [R487].

In October 2014, Plaintiff's lymphedema was improving. [R513]. However, by December 2014, she was hospitalized after going to the emergency room for chest pains and, on examination, had left lower extremity swelling with 1+ edema and a Doppler study showed a non-occlusive DVT. [R545-50]. Coumadin was continued. [R552].

From September 2013 through November 2014, Plaintiff continued to have varying INR rates, requiring ongoing anticoagulant treatment, and her INR was low, requiring increased doses of anticoagulant medication. [R426-33, 441-42, 464, 488, 527-29]. It was still high in January 2015, [R655], when she also reported leg cramping, [R558], and was diagnosed with "some renal insufficiency, but not to the point that it should generate" the high potassium levels it did in her recent emergency room visit, [R560]. However, by February 2015, her INR level was high, [R653], and

---

[53] Amlodipine is a calcium channel blocker that is used alone or in combination with other medications to treat high blood pressure and chest pain. *See* M e d l i n e P l u s , A m l o d i p i n e , http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited 9/18/18).

AO 72A
(Rev.8/8
2)

it was noted that she was largely sedentary because of knee osteoarthritis and morbid obesity, [R568]. By April 2015, her renal function was "back to normal range." [R592].

### 3.    Consultative Examinations

No consultative examinations of Plaintiff were ordered or performed. [R138, 149]. Instead, on April 19, 2014, Abraham Oyewo, M.D., a state agency medical consultant, reviewed Plaintiff's medical records up until that point. [R138-43]. Dr. Oyewo concluded that one or more of Plaintiff' medically determinable impairments could be reasonably expected to produce her pain or symptoms, but her statements about their intensity, persistence, and functionally limiting effect were not substantiated by the objective medical evidence (specifically, her treatment and medications). [R139]. Dr. Oyewo noted that there was no indication of medical or other opinion evidence in record. [*Id.*] Dr. Oyewo concluded that, based on her lymphedema, Plaintiff could occasionally lift or carry (including upward pulling) 20 pounds occasionally and 10 pounds frequently; stand, sit, or walk for a total of six hours in an eight-hour workday; had limited pushing and pulling in her left lower extremities; and no postural or manipulative limitations. [R140].

23

On August 25, 2014, Bato Amo, M.D., a state agency medical consultant, reviewed Plaintiff's medical records up until that point. [R149-52]. Dr. Amo's conclusions were identical to Dr. Oyewo's, except that he concluded Plaintiff would be limited to frequent right overhead reaching. [R150-51].

### D.    Vocational-Expert Testimony

The VE described Plaintiff's past work as follows: accounting assistant and a receptionist, both sedentary, semi-skilled jobs; secretary, sedentary, skilled job; caregiver, medium, semi-skilled job, performed at the medium to heavy exertional level by Plaintiff; and personal caregiver, light, unskilled job. [R131-32]. The VE concluded that if limited to light work with frequent overhead reaching, Plaintiff could perform all her past work except that of a caregiver (which was medium or heavy). [R132]. There would be no jobs if Plaintiff needed to elevate one or both legs above heart level during the workday, [R132], nor could she perform her past work if her medications caused drowsiness sufficient to require her to lie down and take two 30 minute naps (in addition to an hour for lunch) or go to the doctor three of four times a month for a full day. [R133-34].

## IV.    *ALJ'S FINDINGS OF FACT*

The ALJ made the following findings of fact:

AO 72A
(Rev.8/8
2)

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2017.

2.    The claimant has not engaged in substantial gainful activity since August 25, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following impairments which are severe in combination: obesity and right rotator cuff syndrome (20 CFR 404.1520(c)).

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

. . .

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can only frequently perform overhead reaching with the dominant arm.

. . .

6.    The claimant is capable of performing her past relevant work as an accounting assistant, secretary, receptionist and personal caregiver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

. . .

AO 72A
(Rev.8/8
2)

7.     The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2013, through the date of this decision (20 CFR 404.1520(f)).

[R74-81].

In her evaluation of Plaintiff's alleged impairments, the ALJ found that Plaintiff's obesity and right rotator cuff syndrome were "determined by medically acceptable evidence including signs, symptoms, and laboratory findings." [R74]. The ALJ noted that Plaintiff was diagnosed with DVT, on long term use of anticoagulants, resolved with medications, sciatica with lumbar stenosis and disc bulges with no stenosis, essential hypertension, and right carpal tunnel syndrome. [R75]. However, the ALJ found that Plaintiff's allegations of "chronic kidney disease with lymphedema . . . was not seen in the medical records and is therefore not a medically determinable impairment. As there is no showing that these impairments cause any more than a minimal effect on the ability to do basic physical work activities, they are found to be non-severe." [*Id.*].

In evaluating Plaintiff's residual functional capacity ("RFC"), the ALJ noted that, although Plaintiff alleged that her heart physician advised her that she needed to elevate

26

her leg when it swells, "there are no medical records of evidence to justify the need to elevate the leg above the heart as claimant testified." [R76].

The ALJ summarized the records and concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence of record for the reasons explained in this decisions." [R80]. The ALJ noted that

> there are no significant exertional or non-exertional work-related limitations present in the record that would totally preclude the claimant from working on a sustained basis. The medical record is void of any objective clinical evidence to substantiate the claimant's contention that she is physically limited as she claims. She remains capable of several activities of daily living. There is no clinical medical evidence in the record that suggests that the claimant is incapable of any work activity. The claimant's complaints coupled with the longitudinal medical evidence of record fails to indicate that she is precluded from work activities.
>
> As for the opinion evidence, state agency medical consultants determined that the claimant would be capable of light work with additional postural limitations.[54] The opinions are generally consistent with the overall medical evidence of record and are given great weight.

[R81 (internal citations omitted)].

## V.   *STANDARD FOR DETERMINING DISABILITY*

---

[54]   The ALJ's decision does not discuss these records.  [R72-81].

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228

AO 72A
(Rev.8/8
2)

(11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.

29

*Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

30

of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

31

substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007). In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id.* at 1262. This means that the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id.* at 1266-67 (quoting 20 CFR 404.970(b)).

## VII. CLAIMS OF ERROR

Plaintiff's over-arching claim is that the ALJ's decision lacks substantial evidence because she failed to properly evaluate all of Plaintiff's impairments and, consequently, rejected Plaintiff's claims about her pain and limitations. [Doc. 11 at 1, 4]. Plaintiff addresses this argument by more specifically referring to those

32

impairments and the manner in which the ALJ failed to properly evaluate them, so the Court will consider them in the order in which Plaintiff addressed them in her brief.

### A.     Parties' Arguments

Plaintiff contends that the ALJ rejected her "pain and limitations based on her erroneous assessment of [her] impairments — severe and nonsevere — and on impairments she found to be not medically determinable impairments, so her rationale for rejecting [her] statements of her limitations is not supported by substantial evidence." [Doc. 11 at 5].  However, the only part of the decision Plaintiff points to is the ALJ's determination, at step two, that Plaintiff alleged chronic kidney disease with lymphedema which was not in the record.  [*Id.*].

The Commissioner responds that this is merely a semantic issue, as the ALJ properly stated there was no "*chronic* kidney disease" in the record and no actual diagnosis of kidney disease, merely a suggestion of it.  [Doc 12 at 11].  Plaintiff replies that the Commissioner is splitting hairs, as the record reflects that she was discharged with "acute renal failure" and "possible chronic kidney disease."  [Doc. 13 at 4 (citing [R349])].

The Commissioner also contends that the ALJ found Plaintiff's DVT, which "caused swelling in Plaintiff's leg (lymphedema), was a medically determinable

AO 72A
(Rev.8/8
2)

impairment[.]" [Doc. 12 at 12 (citing the Mayo Clinic's online definition of Lymphedema as "swelling that generally occurs in one of your arms or legs.")]. Notably, neither the Commissioner nor the ALJ drew from any part of Plaintiff's medical records showing that her DVT, in fact, caused her lymphedema. Plaintiff replies that the reasons given by the ALJ for rejecting this impairment as medically determinable are that it is not in the record and, to the extent that the ALJ incorrectly linked them as the same disease, her reasons for rejecting Plaintiff's separate impairments of kidney disease and lymphedema are factually incorrect. [Doc. 13 at 5]. Moreover, Plaintiff argues, it is inaccurate to equate DVT and lymphedema. [*Id.* at 5-6].

**B.    Discussion**

*1.    ALJ Analysis of "Chronic Kidney Disease with Lymphedema"*

The Court agrees that, as it presently reads, it is unclear whether the ALJ assessed Plaintiff's lymphedema and chronic kidney disease as a single impairment or two, discrete ones, and whether that confusion caused her to conclude that they were not in the record or medically determinable impairments. The issue is not merely that the ALJ considered Plaintiff's alleged impairments and concluded they were not severe. Rather, she determined that they are not medically determinable impairments at all

34

without any citation whatsoever to a record that is replete with discrete diagnoses of the same.[55]

At step two, the ALJ must determine if the claimant has any severe impairment. "This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (citations omitted). However, even if an ALJ finds that an impairment is not severe, she is still required to include all of a claimant's impairments, severe and nonsevere, in the RFC. *See Jamison*, 814 F.2d at 588 ("The ALJ must consider the applicant's medical condition taken as a whole.") (citing *Hudson v. Heckler*, 755 F.2d 781, 785 & n. 2 (11th Cir.1985); *Bloodsworth*, 703 F.2d at 1240); *Hooper v. Acting Comm'r of Soc. Sec.*,

_____

[55]     By way of example, in September 2013, Plaintiff was referred to physical therapy specifically for treatment for lymphedema, [R397], and her progress in therapy was noted through 2013 and into October 2014, [R513]. Similarly, in August 2013, Plaintiff was diagnosed with acute renal failure with possible underlying kidney disease, [R384]; in March 2014, an unspecified kidney and ureter disorder were mentioned as past diagnoses, [R465]; and after varying INR levels, in January 2015, she was diagnosed with "some renal insufficiency, but not to the point that it should generate" the high potassium levels it did in her recent emergency room visit, [R560].

AO 72A
(Rev.8/8
2)

No. 616CV1978ORL41PDB, 2018 WL 1216089, at *8 (M.D. Fla. Feb. 12, 2018) ("Though an ALJ need not identify all impairments that should be severe at step two, she must demonstrate she considered all of the claimant's impairments—severe and non-severe—in combination in assessing a claimant's RFC.   20 C.F.R. § 404.1545(a)(2)."), *report and recommendation adopted sub nom. Hooper v. Comm'r of Soc. Sec.*, No. 616CV1978ORL41PDB, 2018 WL 1183347 (M.D. Fla. Mar. 7, 2018).

Here, the ALJ determined Plaintiff had severe impairments, albeit not "chronic kidney disease with lymphedema[,]" and proceeded to step three, to determine if any of Plaintiff's impairments or combination thereof, severe or not, constituted a disability. [R74].  However, whether the ALJ understood and analyzed "chronic kidney disease with lymphedema" as a single impairment or two separate impairments is crucial because, in evaluating lymphedema and whether it meets or medically equals a listing, the Commissioner

> will evaluate lymphedema by considering whether the underlying cause meets or medically equals any listing or whether the lymphedema medically equals a cardiovascular listing, such as 4.11, or a musculoskeletal listing, such as 1.02A or 1.03.  If no listing is met or medically equaled, we will evaluate any functional limitations imposed by your lymphedema when we assess your residual functional capacity.

20 C.F.R. pt. 404, subpart P, app. 1 §§ 4.00G, 4.04B.

36

AO 72A (Rev.8/8 2)

While it is not necessarily error for the ALJ to find that Plaintiff's lymphedema was not medically determinable or find it non-severe, it was error for her to make these findings without sufficient specificity to show the Court that she understood what impairments Plaintiff was alleging and correctly analyzed all Plaintiff's impairments at step three. "While an ALJ is not required to discuss every piece of evidence on the record, [s]he must nonetheless 'develop a full and fair record,' which, at least, means that h[er] opinion must describe h[er] analysis with enough detail to satisfy a reviewing court that [s]he gave all relevant evidence before h[er] its due regard." *Day v. Berryhill*, No. 1:17-CV-252-WSD, 2018 WL 564480, at *3 (N.D. Ga. Jan. 26, 2018) (Duffey, J., *adopting* Salinas, M.J.) (quoting *Reed v. Astrue*, No. 09-0149-KD-N, 2009 WL 3571699, at *2 (S.D. Ala. Oct. 26, 2009)) (quotation marks altered); *see also Bagley v. Astrue*, No. 3:08-cv-591-J-JRK, 2009 WL 3232646, at *8 (M.D. Fla. Sept. 30, 2009) ("Although there is no rigid requirement that the ALJ specifically refer in his or her decision to every piece of evidence, the ALJ's decision cannot broadly reject evidence in a way that prevents meaningful judicial review.") (citing *Dyer*, 395 F.3d at 1211). As a result, there is confusion concerning how and whether the ALJ interpreted Plaintiff's lymphedema as a discrete condition at step two, and, on the basis

37

of this incorrect interpretation, subsequently improperly analyzed Plaintiff's impairments at steps three[56] and four.[57]

The Commissioner attempts to explain the ALJ's conclusions by asserting, without any citation to the record whatsoever, that the ALJ's confusion was harmless error because Plaintiff's lymphedema is merely a symptom of her DVT, rather than a discrete condition. [Doc. 12 at 12].  First, this is an impermissible post hoc rationalization.  *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion.  Such an approach would not advance the ends of reasoned decision making.").  Second, and more problematically, the record shows no factual support whatsoever for the assertion that Plaintiff's lymphedema was implicitly considered in conjunction with her DVT.  As a result, the Court cannot say that the ALJ "describe[d] h[er] analysis with enough detail to satisfy a reviewing court that [s]he gave all relevant evidence before h[er] its due regard."  *Day*, 2018 WL 564480 at *3.

---

[56]     The ALJ concluded that Plaintiff did not meet or medically equal a Listing and that she could perform light work except she could only frequently overhead reach with her dominant arm.  [R75].

[57]     The ALJ concluded that Plaintiff could perform her past relevant work, based on VE testimony that confirmed she could if she had the RFC assigned by the ALJ.  [R81].

38

### 2. *ALJ Reliance on Non-Examining Sources*

In addition, the Court observes that the ALJ relied exclusively on the opinions of non-examining, state agency physicians, in reaching the RFC determination. [R81]. While the ALJ may confer greater weight to the opinions of non-examining sources, those opinions, by themselves cannot constitute substantial evidence. *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam). However, "the opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions of examining physicians or other medical evidence in the record." *Hogan v. Astrue*, Civil Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (harmonizing Eleventh Circuit cases); *see also* SSR 96-2p, 1996 WL 374188. Here, the ALJ explained that she gave these opinions great weight because they were supported by the other evidence in the record. [R81]. However, as previously discussed, the ALJ did not clearly or completely analyze Plaintiff's impairments at steps two and three, so her blanket reliance on other medical evidence in the record, without any consultative examinations, is erroneous.

AO 72A
(Rev.8/8
2)

Here, the Commissioner argues that this is harmless error because the ALJ concluded that Plaintiff's conditions were synonymous. [Doc. 12 at 12]. However, the ALJ did not articulate this conclusion, nor did the ALJ cite to any medical sources that did. Assuming the ALJ implicitly found that Plaintiff's lymphedema and DVT are the same, that is a medical determination reached without any supporting citation *and* without the support of any examining medical source. "In carrying out h[er] duty to conduct a full and fair inquiry, the ALJ is required to order a consultative examination when the record establishes that such an examination is necessary to render an informed decision. . . Additional medical evidence may be required in order to obtain more detailed medical findings about the claimant's impairment(s), to obtain technical or specialized medical information, or to resolve conflicts or differences in the medical findings already available. If the claimant's treating physician could not provide an opinion as to the claimant's functional limitations, then the ALJ should have ordered a consultative examination rather than rely on the opinions of non examining physicians." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1374 (N.D. Ga. 2006) (internal citations omitted); *Fontanez ex rel. Fontanez v. Barnhart*, 195 F. Supp. 2d 1333, 1355 (S.D. Fla. 2002) (ALJ erred in not obtaining a medical source statement from any of the consultants who actually examined the claimant); *Hernandez v. Barnhart*,

40

203 F. Supp. 2d 1341, 1355 (S.D. Fla. 2002) ("the ALJ erred in not obtaining a medical source statement from the consultants who actually examined Plaintiff. . . Therefore, it appears, as Plaintiff suggests, that the ALJ may have improperly "played the role of medical expert, interpreted the raw psychological and medical data, and drew her own conclusions as to the claimant's RFC."); *see also Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1991) (per curiam) (Johnson, J., concurring) (observing that since "the ALJ made no factual findings supporting an inference that the treating physicians were incompetent or otherwise failed to perform their duties in a professional manner, the ALJ's decision not to credit seriously the[ir] medical diagnoses . . . cannot stand. Although the ALJ could have legitimately discounted the diagnoses, he could have done so only if he had clearly articulated his reasons for such action. Moreover, the ALJ's proffered reasons for discounting the diagnoses had to be supported by substantial evidence. In this case, the ALJ has not articulated any valid reasons for calling into question the diagnoses—much less supported his medical conclusions with substantial or considerable evidence. Although Social Security disability benefits must be reserved only for those who qualify to receive them, an ALJ may not arrogate the power to act as both judge and physician. . . On remand, let us hope that the ALJ refrains from playing doctor and instead satisfies himself with merely serving as a

41

judge.") (internal citations omitted); *Cole-Smith v. Astrue*, 2:11-CV-2857-VEH, 2012 WL 1946766, at *6-7 (N.D. Ala. May 29, 2012) (acknowledging "that the ALJ did refer within his opinion to a host of records from various medical providers . . . However, for the most part, such documentation is reported merely as raw physical findings . . . none of these records includes an opinion about the impact of [Plaintiff's] impairments in vocational terms or attaches a physical capacities evaluation of her. . . a lay person such as an ALJ is not able to discern [Plaintiff's] . . . work-related exertional abilities and appropriate non-exertional restrictions based upon the unfiltered information contained in her medical records."); *Rogers v. Barnhart*, No. 3:06-CV-0153-JFG, (N.D.Ala. Oct. 16, 2006) ("While the Record contains [Plaintiff's] medical treatment history, it lacks any physical capacities evaluation by a physician. The ALJ made his residual functional capacity evaluation without the benefit of such evaluation. An ALJ is allowed to make some judgments as to residual physical functional capacity where so little physical impairment is involved that the effect would be apparent to a lay person. In most cases, including the case at bar, the alleged physical impairments are so broad, complex, and/or ongoing that a physician's evaluation is required. In order to have developed a full, fair record as required under the law, the ALJ should have re-contacted [Plaintiff's] physicians for physical

42

capacities evaluations and/or sent her to physicians for examinations and physical capacities evaluations.").

Here, because (1) it is unclear if the ALJ's decision considered all of Plaintiff's impairments, and (2) the ALJ relied on non-examining medical opinions, the Court cannot say that her decision was supported by substantial evidence. Accordingly, the Court **REVERSES and REMANDS** the case so that the Commissioner can: (1) consider and evaluate all of Plaintiff's impairments, severe and non-severe; and (2) if necessary, recontact Plaintiff's treating physicians and/or order a consultative examination in order to have a basis to formulate a complete RFC.

## VIII. CONCLUSION

In conclusion, the final decision of the Commissioner is **REVERSED and REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order and Opinion.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this  20th  day of September, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/8 2)